UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DAVID BURNETT,<br><br>                    Plaintiff,<br><br>v.<br><br>TETON PRESTRESS CONCRETE,<br>LLC, and HAL SIMMONS,<br><br>                    Defendants. | Case No. 4:24-cv-00074-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

Before the Court is Defendants Hal Simmons and Teton Prestress Concrete, LLC's (collectively "Defendants") Motion for Summary Judgment. Dkt. 15. On July 14, 2025, the Court held oral argument and took the Motion under advisement. Upon review, and for the reasons set forth below, the Court GRANTS IN PART and DENIES IN PART the Motion for Summary Judgment.

## II. BACKGROUND

Plaintiff David Burnett is a white male who was employed at Teton Prestress from March–May of 2022. Burnett is married to a Filipino woman, with whom he shares children, and his best friend is Black. Those associations are at the center of this case, as several employees at Teton Prestress engaged in the use of racial slurs. After first hearing his coworkers use such slurs, Burnett explained to his coworkers that he had Filipino, Black, and Latino friends and family, and was not comfortable with the use of the slurs.

MEMORANDUM DECISION AND ORDER - 1

Unfortunately, Burnett's coworkers repeatedly continued to use racist language over Burnett's objections.

Burnett directly accuses five coworkers of using offensive language: Hal Simmons, Tim Jackline, Craig Andrews,[1] Brian Scott, and Kyle Fuller. Burnett accuses Simmons of referring to a Mexican employee as a "beaner" outside of that employee's presence. Andrews also referred to members of the Black Lives Matter movement as "clowns." During his deposition, Burnett could not recall Scott making any racial comments, but testified Scott threatened Burnett with anal sex if he "did something [Scott] did not like."[2] Dkt. 16-1, at 3. However, in his statement of facts opposing the instant Motion, Burnett did claim Scott had previously used the "n-word." Dkt. 16-1, at 3.

Burnett attributes the most frequent and serious conduct to Jackline and Fuller. In particular, he accuses Jackline of joking about black people's noses, about them fearing chainsaws, and his inability to be racist because he has a colored TV. Jackline also once used the slur "jigaboo," used the "n-word" often, and "frequently" told inappropriate jokes that Burnett cannot fully remember. Burnett does recall one "joke:" he alleges Jackline claimed cotton is placed in Advil bottles to "remind niggers that they used to pick cotton." Dkt. 16-2, at 9.

Burnett also accuses Fuller of using the "n-word" frequently, including saying "fuck the [n-word]s" when Burnett described having a Black friend on an NFL team. Dkt. 16-1,

---

[1] Burnett did not identify Andrews as a person who made racist comments during his deposition, and notably concedes in his statement of facts that Andrews never made racist comments. Dkt. 16-1, at 6.

[2] Burnett admitted during his deposition that he did not feel this threat was in relation to his or anyone else's race or ethnicity but was rather referring to his work performance. Dkt. 15-4, at 5.

at 3. Burnett claims to have told both Fuller and Jackline, "You can't say that" after these incidents.

Ultimately, it was the use of the "n-word" that culminated in Burnett's resignation. On May 19, 2022, Burnett told Jackline that he could not use the "n-word" after Jackline told the "joke" about Advil. Fuller responded: "People say the n-word around here. If you don't like it, you can go back to California."[3] *Id.* at 4. During this exchange, Andrews told Burnett: "If you think that's bad, we had to convince [Simmons] to take down a sign hanging in the shop that said, 'Mexicans need not apply.'" *Id.* Fuller then told Burnett to go look at a noose which had been hung from a girder and was resting on top of a steel support. The noose was hung in the general area above Burnett's workstation. The parties disagree as to how long the noose had been hanging from the ceiling. Defendants claim it had hung there for years, but Burnett claims there was no dust on the noose, and he had never seen it there before. Burnett interpreted this as a threat to his life for continuing to object to the racist remarks of his colleagues.

Almost immediately after the latter incident, Burnett again spoke with Andrews, who was a supervisor at Teton Prestress.[4] Burnett told Andrews that what was happening "wasn't right." *Id.* at 5. In response, Andrews made a dismissive facial expression. At that point, Burnett felt like the environment would not get any better, so he quit and left the premises. Burnett never made any report to anyone in management about any of the

---

[3] Burnett had recently relocated from California to Idaho before taking the job at Teton Prestress.

[4] It is not entirely clear from the pleadings what role Andrews had at the company, nor what his position was in relation to Burnett. The Court will address this issue in its analysis of whether Burnett engaged in a protected activity.

comments and incidents he disagreed with, as he felt all members of management were either complicit or indifferent.

On July 1, 2022, Burnett filed charges of discrimination with both the Equal Employment Opportunity Commission ("EEOC") and the Idaho Human Rights Commission. Over a year later, in October 2023, the EEOC Director, Elizabeth M. Cannon, made a finding of probable cause as to Burnett's claims. Subsequently, on February 7, 2024, Burnett filed the instant suit.  On March 24, 2025, Defendants filed their Motion for Summary Judgment (Dkt. 15), claiming Burnett, as a white male, was not discriminated against in such a manner as to constitute a viable claim. The matter is now ripe for review.

### III. LEGAL STANDARDS

#### A. Summary Judgment

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On summary judgment, the Court does not weigh the evidence and determine the truth of the matter but rather determines whether there is a genuine issue for trial. *Zetwick v. Cnty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017). In considering a motion for summary judgment, the Court must "view[] the facts in the non-moving party's favor." *Id.* The non-moving party must only present evidence upon which "a reasonable juror drawing all inferences in favor of the respondent could return a verdict in [his or her] favor." *Id.* The non-moving party cannot simply rely on an unsworn affidavit or the pleadings to defeat a motion for summary judgment, but must instead set forth specific facts, supported by evidence, with reasonable particularity that preclude summary

judgment. *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001). The Court may only consider admissible evidence in ruling on a motion for summary judgment. *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002).

### B. Title VII, the Idaho Human Rights Act, and 42 U.S.C. § 1981

#### 1. Associational Discrimination

Several circuit courts have recognized claims for associational discrimination under 42 U.S.C. § 1981 where, as here, a plaintiff has purportedly suffered an adverse action based on their association with someone of another race or national origin. *See Adhvaryu v. Bank of America, N.A.*, 2019 WL 6499211, at *8 (C.D. Cal. Aug. 1, 2019) (collecting cases). Notably, in cases finding discrimination based on an associational theory, the plaintiff faced an adverse employment action based on their race because their race was different from the people with whom they associated.[5] *See id.*; *see also Reiter v. Ctr. Consolidated Sch. Dist., No. 26-JT*, 618 F.Supp.1458 (D. Colo. 1985).

While the Ninth Circuit has not directly recognized stand-alone associational discrimination claims under § 1981, "[i]t is well settled that white persons have standing to sue under section 1981." *Parr v. Woodmen of the World Life Ins. Co.*, 791 F.2d 888, 890 (11th Cir. 1986) (citing *McDonald v. Santa Fe Trail Transportation Company*, 427 U.S. 273 (1976)). Additionally, "Title VII has…been held to protect against adverse employment actions taken because of the employee's close association with black friends or coworkers…." *McGinest v. GTE Service Corp.*, 360 F.3d 1103, 1118 (9th Cir. 2004)

---

[5] For example, a plaintiff could be denied employment because of their spouse's race.

(quoting Arthur Larson, EMPLOYMENT DISCRIMINATION § 51.02 (2d ed. 2003)).

To make a claim for associational discrimination, Burnett must show he faced discrimination because of prejudice towards his associates' differing race, or prejudice against the interracial association itself. *See Whitfield v. Trade Show Servs., Ltd.*, 2012 WL 693569, at *3 (D. Nev. March 1, 2012). Burnett must also establish that the root cause of any adverse action was prejudice against his associates' race. *Id.* at *4.[6] An adverse employment action includes constructive discharge. *Jordan v. Clark*, 847 F.2d 1368, 1377 n. 10 (9th Cir. 1988). Constructive discharge occurs when a reasonable employee is faced with intolerable and discriminatory working conditions such that they feel they must quit. *Watson v. Nationwide Ins. Co.*, 823 F.2d 360, 361 (9th Cir.1987).

2. *Hostile Work Environment*

At the outset, claims under Title VII and the Idaho Human Rights Act ("IHRA") are held to the same standards of proof. Thus, a claim that fails under Title VII also fails under the IHRA. *Sengupta v. Morrison-Knudsen Co., Inc.*, 804 F.2d 1072, 1077 (9th Cir. 1986). Additionally, "the legal principles guiding a court in a Title VII dispute apply with equal force in a § 1981 action." *Manatt v. Bank of America, NA*, 339 F.3d 792, 797 (9th Cir. 2003) (cleaned up). So, in analyzing a claim of hostile work environment under any of the

---

[6] In his response briefing, Burnett originally set forth the legal standard for associational discrimination as requiring him to show he : (1) is a member of a protected class; (2) was qualified for his position; (3) experienced an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination. *See Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 603 (9th Cir. 2004). This is the standard for a disparate treatment claim. *Id.* The Court accordingly asked for clarification from the parties on the legal standard for an associational discrimination claim. Burnett provided additional references, upon which the Court has relied in identifying the above legal standard for an associational discrimination claim. Dkt. 22.

three statutes, the standards are the same.

To establish a prima facie claim for hostile work environment under Title VII, the IHRA, or § 1981, the plaintiff must show: (1) he was subjected to verbal or physical conduct because of his race;[7] (2) the conduct was unwelcome; and (3) the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment. *Kang v. U. Lim Am., Inc.*, 296 F.3d 810, 817 (9th Cir.2002). Title VII and § 1981 are not "general civility codes," and "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

   *3.  Retaliation*

A prima facie case of retaliation under Title VII requires a showing from plaintiff that (1) they engaged in a protected activity, (2) their employer subjected them to an adverse employment action, and (3) there is a causal link between the protected activity and the adverse action. *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2003).

A protected activity is one in which the employee opposes an employment practice that either violates Title VII, or that the employee reasonably believes violates that law, including reporting offensive conduct to human resources or a supervisor. *Westendorf v. W. Coast Contractors of Nev., Inc.*, 712 F.3d 417, 422 (9th Cir. 2013); *see also* 42 U.S.C. § 2000(e)-3(a). "Not every act by an employee in opposition to racial discrimination is

---

[7] When making a claim for associational discrimination, this prong is satisfied where the plaintiff was subjected to the conduct because of his interracial association. *See Whitfield*, 2012 WL 693569, at *3.

protected. The opposition must be directed at an unlawful employment practice of an employer, not an act of discrimination by a private individual." *Silver v. KCA, Inc.*, 586 F.2d 138, 141 (9th Cir. 1978).

## IV. DISCUSSION

The Court notes from the start—and none of the parties disagree—that the behavior of, and racial slurs used by, the employees of Teton Prestress that form the basis of Burnett's claims are abhorrent. The Court does not wish to minimize the seriousness of the situation in applying the legal framework to which it is bound. However, the Court must still determine whether Burnett has provided enough evidence that a reasonable juror could find in his favor.

### A. Associational Discrimination

The Court must first address its core concern with Burnett's associational discrimination claim: he has provided very little evidence that his coworkers' use of racial slurs and telling of racially charged "jokes" was motivated by Burnett's presence and by his association with people of color. Burnett's deposition provides little basis to suggest his coworkers were thinking of him at all when they utilized such language. In fact, it appears the employees of Teton Prestress unfortunately engaged in racist behavior prior to Burnett's employment with the company. For example, Simmons had hung the poster related to Mexicans before Burnett began his employment. It was also Burnett's coworkers' racially inappropriate statements that prompted him to tell them about his Filipino family and Black friends. In other words, Burnett's coworkers engaged in racist behavior *before* they could even know about Burnett's associations or his position on the matter.

MEMORANDUM DECISION AND ORDER - 8

While one would hope Burnett's coworkers would stop using racial slurs once he explained he disapproved of such language, the evidence does not indicate the offensive behavior was directed at him. The insults did not appear to be aimed at Burnett, his friends, or his family. There is also little evidence to support Burnett's theory that his coworkers used racist language because they knew he disliked or was offended by such language. In other words, there is little evidence that Burnett's coworkers engaged in offensive behavior in order to make Burnett's employment intolerable or discriminatory. Based on the evidence, it seems Burnett's coworkers were generally determined to continue with their racist rhetoric no matter who was present.

The incident with the noose, however, creates a genuine issue as to whether Burnett was discriminated against because of his interracial relationships. Burnett objected to the use of the "n-word" after repeatedly making it clear that he did not approve of such slurs because of his interracial associations.[8] Construing the facts in Burnett's favor, a reasonable juror could find that being told to return to California if he didn't want to hear the "n-word," and having his attention directed toward a noose near his workstation, was a threat on his life or intended to harass him.[9] It is for a jury to decide whether a reasonable employee in

---

[8] "The word 'nigger' is one of the most nefarious slurs in the English language that carries with it 'a history of racial violence, brutality, and subordination.'" *U.S.E.E.O.C. v. Wedco, Inc.*, 65 F.Supp.3d 993, 1003 (citing *McGinest*, 360 F.3d at 1116).

[9] *Wedco* is particularly relevant under the circumstances. Specifically, here there is debate as to whether the noose was hung prior to Burnett's employment or during it, while the *Wedco* court specifically noted there was no dispute the noose in that case had been hanging for quite some time *before* the plaintiff was hired. 65 F.Supp.3d at 1004. Even though the noose was hung before the plaintiff was hired, the *Wedco* court held directing the plaintiff's attention to the noose, together with the frequent use of the n-word created a genuine issue of fact for the jury. *Id*.

Burnett's position would feel the need to quit because this apparent threat created intolerable working conditions such that he was constructively discharged. Thus, Defendants' Motion is DENIED on this claim.

### B.  Hostile Work Environment

Burnett faces the same difficulty stating a hostile work environment claim as he faced for his associational discrimination claim: Burnett presents little evidence to show he was subjected to hostile verbal or physical conduct "because of his [or his associates'] race." However, as with his associational discrimination claim, the noose turns otherwise unaimed comments and isolated incidents into questions of fact that must be resolved by a jury.

When analyzing whether a work environment is sufficiently hostile, the Court must consider the frequency of the discriminatory conduct, its severity, whether there was a physical component or just an offensive utterance, and whether it unreasonably interfered with an employee's work performance. *Faragher*, 524 U.S. at 787–88. Hostility does not need to be directly targeted at plaintiff, but the plaintiff must show the work environment was both subjectively and objectively hostile. *McGinest*, 360 F.3d at 1117; *Nichols v. Azteca Rest. Enters., Inc.*, 256 F.3d 864, 871–72 (9th Cir. 2001).

There is no question here that Burnett's work environment was subjectively hostile, as he repeatedly told his coworkers they could not say the things they were saying and that such comments were particularly offensive because he had close connections with people of different races. Thus, the question becomes whether the workplace was hostile from the perspective of a reasonable person who shares plaintiff's racial or ethnic identity. *Reynaga*

*v. Roseburg Forest Products*, 847 F.3d 678, 687 (9th Cir. 2017). Burnett is white. While none of the comments made by Burnett's coworkers were ever directed at the Caucasian race, Jackline's final comment was directed at a white person who came to the defense of people of different races. A white person in Burnett's position could reasonably feel hostility was directed toward them after repeatedly objecting to racial slurs based on their interracial connections, and then having their attention directed to a noose. Thus, a reasonable juror could find the work environment in this case was objectively hostile.

Additionally, Jackline's conduct in directing Burnett's attention directly to the noose could be considered a physical component beyond a mere utterance, which bolsters Burnett's argument that his work environment was objectively hostile. In short, Burnett has provided sufficient evidence that a reasonable factfinder could conclude the work environment was subjectively and objectively hostile, and Defendants' Motion is accordingly DENIED as to this claim.

## C. Retaliation

Finally, Burnett's retaliation claim fails because he did not engage in a protected activity. Burnett alleges that three people in management made inappropriate racial remarks: Simmons, Scott, and Andrews. He does not provide any evidence that he confronted any of these three individuals about their remarks in any way, so he did not oppose the racial discrimination.

When it comes to Fuller and Jackline, Burnett did oppose their comments by objecting to them directly, but, given Fuller and Jackline's positions with the company, their actions constituted discrimination by private individuals, and not the employment

practices of Teton Prestress or anyone in its management. While the Court understands Burnett did not feel comfortable reporting to Teton Prestress or management due to his perception that they were complicit or indifferent, Teton Prestress never had any real opportunity to address the situation. While Burnett told Fuller and Jackline their offensive language should not be used and that the hanging of the noose "wasn't right," there is no evidence Burnett ever expressed to management, or even his coworkers, that the language was *offensive* to him, even if it should be common sense that such language is offensive.[10] Had Burnett reported the incidents to anyone in management, he might have engaged in a protected activity. But that did not occur, so his claims for retaliation cannot survive summary judgment.

As a final note, that Burnett did not engage in a protected activity necessarily makes his claim deficient on the other two elements of retaliation as well. Because Burnett neither opposed the actions of anyone in management, nor reported Jackline and Fuller's behavior so it could be addressed by management, Teton Prestress was not aware of any intolerable and discriminatory working conditions such that they could constructively discharge him by failing to remedy the situation. A reasonable white employee would not feel quitting was their only option when exposed to racial slurs directed towards other races if the white employee never reported such conduct to management, nor gave management an opportunity to remedy the situation. Thus, Prestress did not subject Burnett to an adverse employment action.

---

[10] He did repeatedly object to the use of the slurs, but he never used language that would implicate he was reporting to management that he felt harassed.

In short, in the absence of a protected activity, an adverse employment action, and causal link between the two, Burnett's retaliation claim necessarily fails. Thus, Defendants' Motion is GRANTED on this claim.

### D. Simmons' Personal Liability

Defendants argue Simmons cannot be personally liable for any of Burnett's claims because he was never Burnett's employer for purposes of Title VII, the IHRA, and § 1981, and Teton Prestress is a limited liability company. Dkt. 15-2, at 6–7. Burnett argues Simmons *is* personally liable because, as Teton Prestress' sole owner, Simmons knew about the racist conduct, did not stop it, and participated in it at times. Dkt. 16, at 18–20.

Individuals may be held liable under § 1981 if they authorize, direct, or participate in discriminatory conduct. *El-Hakem v. BJY Inc.*, 262 F.Supp.2d 1139, 1147 (D. Or. 2003). However, individual defendants cannot be held liable for damages under Title VII. *Miller v. Maxwell's Intern. Inc.*, 991 F.2d 583, 587 (9th Cir. 1993). Regardless of whether § 1981, Title VII, or the IHRA apply, Simmons cannot be held personally liable given the facts of this case.

Specifically, there are only two instances in which Simmons allegedly engaged in racist behavior: when he referred to an employee as a "beaner" to Burnett, and when he hung a poster that stated, "Mexicans need not apply," which was removed before Burnett was employed with the company. None of Burnett's associates were Hispanic, Burnett never objected to Simmons' use of the word "beaner," there is no evidence Simmons was ever present for any of the incidents of inappropriate behavior by any of the other employees, and Burnett never reported any of the incidents to Simmons. Therefore,

Simmons did not participate in the discriminatory conduct at the core of Burnett's claims, apart from one off-hand comment that did not reference a race with which Burnett associates. Additionally, Simmons did not authorize Jackline and Fuller's behavior because there is no evidence he was even aware of it. Therefore, while Burnett's claims for associational discrimination and hostile work environment may move forward against Teton Prestress, they are dismissed against Simmons.

### V. CONCLUSION

Burnett presents evidence that Jackline told him to return to California if he had continual problems with the use of the "n-word" and directed his attention to a noose hung above his workstation. A reasonable juror could conclude that Jackline's conduct constituted associational discrimination and a hostile work environment. Thus, Burnett has raised genuine issues of material fact, and his associational discrimination and hostile work environment claims will move forward. On the other hand, Burnett never engaged in a protected activity to support a claim of retaliation, and Defendants are therefore entitled to summary judgment on that claim. Finally, Simmons did not participate in the discriminatory conduct at issue in any way and is likewise entitled to summary judgment in his favor.

### VI. ORDER

**IT IS HEREBY ORDERED:**

1. Defendants Hal Simmons and Teton Prestress Concrete, LLC's Motion for Summary Judgment (Dkt. 15) is **GRANTED IN PART** and **DENIED IN PART**.

MEMORANDUM DECISION AND ORDER - 14

a. Burnett's claims for associational discrimination and hostile work environment may proceed against Teton Prestress but are **DISMISSED** as to Simmons.

b. Burnett's claim for retaliation against Teton Prestress and Simmons is **DISMISSED** with prejudice.

DATED: September 23, 2025

David C. Nye
Chief U.S. District Court Judge

MEMORANDUM DECISION AND ORDER - 15